Good morning, your honors, and may it please the court. My name is Kathleen Sullivan, and I represent the appellants Farrell Williams, Robin Thicke, and Clifford Harris. My colleague, Mr. Haddad... Before we go too far, maybe you're going to already explain this, but we don't take the time yet, but you're going to explain to us how you're going to handle rebuttal, how you're dividing up time? Yes, your honor. I will be splitting argument with Mr. Haddad, who will represent the interscope parties. We've split our time 14 and 6, and we'd each like to reserve some rebuttal. So I'd like to reserve two, he'd like to reserve one. So once we get going, your honor, we're happy to stay longer if your honors wish us to, but we'll try to split the time in that manner. We're grateful to have so many distinguished lawyers here on all sides, so please proceed. Thank you. Blurred Lines and Got to Give It Up are not the same song, and they are not substantially similar songs by the only measure that matters here, and that is the comparison of Blurred Lines to the deposit copy for Got to Give It Up, filed with the Copyright Office in 1977 by the Motown publisher Jobette Music Company. The deposit copy should have been the focus of this case. It wasn't. This case was not about the sound recording for Got to Give It Up. It was not about the groove and feel of Got to Give It Up. It was not about inspiration by the great artistry of Marvin Gaye. It was about one simple question, substantial similarity between the melody, lyrics, harmony, chords, instrumentation in the deposit copy and Blurred Lines. Let me ask you this. I get your point, but one of the arguments, of course, that was made is that we're not really looking at a note-by-note comparison. The testimony of experts at Pazell and Monson, their testimony suggested that there was more to it than that. We also have the issue in our circuit, of course, of ability to have access. And I think your clients have stipulated, really, that they had access. They knew about Got to Give It Up. They knew about Marvin Gaye. So the more they know, at least in our circuit, it seems like there's almost a sliding scale under the three boys case, that the more access you have, the less of a showing you need to make. So given that fact and given the fact that you only appealed three of the eight significant aspects that were testified to by Pazell, I think it was the theme acts, the bass, and the keyboard rhythm. Is the rest of that uncontested? I mean, its weight is a different issue, but are you contesting the other five elements that she tested about, argued about? Your Honor, let me go back and take the questions in turn. First of all, about whether there was more than individual elements. Yes, the Gaye's expert, Ms. Finnell and Ms. Monson, testified about a constellation. This is not a constellation case. It's not a compilation case. Why not? Because there was no virtual identity here. And we know that virtual identity is the standard in a compilation case under Apple against Microsoft. This is not a constellation case. So let's take constellations out of it. As to what we're contesting, Your Honor, there's really two grounds for you to send this back for a new trial. And let me start there. The instructions did not instruct, as Your Honor just described, the correct test for substantial similarity. Even on a sliding scale, what the jury should have been instructed is that it had to find substantial similarity between the protectable elements in the deposit copy and got to give it up. Now, Your Honor, we do think there were only three protectable elements in the deposit copy, and the district court, in his meticulous effort to do his analytic dissection, correctly identified those three protectable elements in the deposit copy. And they were, as Your Honor says, the signature line, the signature phrase, I used to go out to parties and got to give it up and going to take a good girl. That's why I'm going to take a good girl in flirt lines. The hooks, keep on dancing and take a good girl. And the four-bar baselines. Those are the only three that were protectable. And we think if you look at our brief, you will see that no properly instructed jury could have found those three protectable elements substantially similar. If I could refer you, we've put the sheet music in the briefs, Your Honor, at blue brief 33, blue brief 35, blue brief 36. And I would also commend to Your Honors the musicologist's amicus brief at docket 20, which does a devastating comparison of those three elements and shows that they are not substantially similar. Counselor, can I have you step back for a moment on the procedural? Because the briefs really focus on the fact that Williams and the Thicke and Harris parties should prevail as a matter of law because under the extrinsic test, there's no substantial similarity there. Are you, given the procedural posture in this case, we're past summary judgment, right or wrong, the district court denied it, you've gone through a full trial, the JMLL issue wasn't properly preserved, a failure to file a Rule 50 motion. So the best outcome that you're asking for in this case, that you hope for is essentially a remand for a new trial? No, Your Honor. How do we circle back to what you keep talking about in the briefs in terms of judgment as a matter of law under the extrinsic test, not letting it go to the jury? I just don't see a way to circle back at this point. Yes, Your Honor. And the best outcome we hope for is a reversal where you decide now that under the extrinsic test, which is an objective test that's resolvable as a matter of law where there are undisputed facts, you could decide right now to reverse and direct entry of judgment for all parties in the case. How do we get there given the JMLL issue not being properly preserved? Your Honor, the answer is this Court's law in Banuelos, Escriba, and Post-Ortiz, as reaffirmed in Fireman's Found, a case that Judge Smith and I got to talk about in Portland some time ago. You have held in this circuit that summary judgment, denial of summary judgment is still appealable after trial in the rare case where there's a purely legal error at summary judgment. But here it wasn't a purely legal error. It was, if anything, a misapplication of the extrinsic test to the facts of this particular case, right? How do you get to characterizing it any other way? Understood, Your Honor. It was a legal error in two respects. First, and this is the key to the case, the district court did not restrict the evidence he reviewed at summary judgment to the deposit copy. But he filtered it out. He said he filtered it out. Well, he shouldn't have admitted it. Your Honor, Banuelos was a case, citing prior circuit law, about admitting legally inadmissible testimony. There's state peril evidence. Here, the reason why Monson and Fennell were dead inadmissible, dead inadmissible at summary judgment, is they were relying on the sound recording of got to give it up and not on the deposit copy. There's an admission, Your Honor, I refer you to ER 699. Dead to rights, Ms. Fennell testified that she never looked at the deposit copy at summary judgment. So just as in Banuelos, there was legally inadmissible evidence that provided the basis for the summary judgment denial. Second, Your Honor, it was legal error not to cash out the comparison. The judge engaged in a meticulous analytic dissection and didn't compare the protectable elements that he found filtered out to the deposit copy. Can we go back just a minute? I get your point about the ethics and the record and so on, but to my great surprise, you all didn't even cite Ortiz. Not even in the brief, as far as I can tell. We did, Your Honor. We responded to Ortiz in the yellow brief and we reminded the court that in the fireman's side. But not in the opium brief. That's correct, Your Honor. And that is the case about overturning or going back to a summary judgment. We did indeed have the colleague that you were talking about in Portland, and there are circumstances where it can happen. But Ortiz, we've never dealt with Ortiz as a circuit. It's there. And kind of like my colleague said, how do you put the genie back in the bottle? It seems to me that your best argument here is if all these things are true, that you say that this testimony of Finnell and Monsen should never come in, they didn't focus on the deposit copy, then, you know, we need to send it back for a new trial. But we can't overturn the judges' ruling on the summary judgment at this point, can we? You can, Your Honor, because you did address Ortiz in the fireman's fund decision. I accept that it's unpublished, but you did note that nothing in it. That makes a difference. It does, Your Honor. Nothing in it. You said, and I believe it's correct, nothing in Ortiz, because Ortiz didn't reach the question of if it's a legal issue. And I realize I have to persuade Your Honor these were legal issues, legally inadmissible evidence and legal failure to make the comparison. But you expressly said in fireman's fund that nothing in Ortiz overturned Ben Willis. But I hear Your Honor's point, and I want to get to why you must at least send it back for a new trial, if I may. That's right. I would like to ask about that. Yes, Your Honor. Aside from this motion for summary judgment and reconsidering it, it seems like the other central issues in the case relate to the expert testimony and what you allege are erroneous jury instructions. Yes, Your Honor. And so I'd like to know, if we found that the district court erred in admitting certain expert testimony regarding issues that I think you contest were not reflected in the deposit copy, wouldn't we be undermining the jury's requirement to engage in this intrinsic part of our substantial similarity test? One of the focuses here is how do we incorporate if the intrinsic part of the substantial similarity test seems like the district court did what he thought was the best thing to do in light of this 1909 copyright? So, Your Honor, we're not suggesting that the only issue here was the intrinsic test. We do note that you could apply the intrinsic test yourselves. We've given you a disc which has the relevant comparison. You just need to listen to trial exhibit 141, which is an audio that faithfully replicates what the music is in the deposit copy. You've got three real experts here to do that, right? You have law clerks, Your Honor. And the law clerks can play trial exhibit 141 and compare it to trial exhibit 529.1. So you're suggesting that we have the law clerks decide? Not at all, Your Honor, just to assist. But I want to go back. But, Your Honor, the key point is, of course, the test here is additive. Your test requires that the extrinsic and the intrinsic test be satisfied. So, of course, you can send it back and let the jury do the intrinsic test over again. But the reason you have to send it back is that the instructions were erroneous on the extrinsic test, and the admission of the evidence was an abuse of discretion with respect to the extrinsic test. Let's talk about jury instruction 43, because I think that's the other. To me, it seems like that's one of the key challenges. Yes, Your Honor. So how – and it seems that you're objecting to a couple things, the word must, and then the listing of several of the music components presented at trial that prejudiced your client. Yes, Your Honor. Is that correct? I'd love to elaborate, but, Your Honor, I've now hit the point for my opening remarks, if I'm going to save time for Mr. Haddad and rebuttal. However you want to work it. Is it acceptable to Your Honor to answer? Why don't you answer my colleague's question, and then we'll work the time, okay? Very good. Thank you, Your Honor. Your Honor, our objections to instruction 43 are, it did not require the jury to apply the extrinsic substantial similarity test to compare blurred lines to the protectable elements in the deposit copy. Now, why didn't it do that? Because it doesn't, and no other instruction ever tells the jury that it must, to find copying, compare blurred lines to the corresponding elements in the deposit copy. Now, Your Honor, this is important, because I know my friend on the other side is going to get up and say, but all the other surrounding instructions were curative. And I'm sure she'll point to instructions 25, 26, 30, and 35, which did elsewhere gesture to generic idea of unprotectable elements. But never is there any instruction that says you must conduct the comparison between blurred lines and the protectable elements in the deposit copy. They all say, amen. I promise you, Your Honor, that the general reference to unprotectable elements can't be cured, because no other instruction requires the comparison. That's point one. Point two, Your Honor, is the instruction here, not only is it a textbook violation of Harper House, because it doesn't filter out the unprotectable elements. It doesn't say, don't consider the unprotectable elements. In the Led Zeppelin case, the court factored out descending arpeggios and descending chromatic scales arpeggios in short sequences of three notes, and voila, a similar case came out the other way. If you filtered out the unprotectable elements here, it would have been a different case. But this is worse than Harper House, because instruction 43 goes on to list unprotectable elements not in the deposit copy. The court instructed the jury that there was evidence on theme X. But it says right before there, as to such matters as, and that it isn't an exclusive list. So I'm just trying to figure out why is it prejudicial given that sort of non-exclusive structure. Because, Your Honor, your precedents require the district court to be a gatekeeper and to filter out unprotectable elements, not to tell the jury it may consider them. I just want to make clear, are you arguing that the instructions should have listed only the protectable elements? No, Your Honor. We're arguing that the instructions should have, A, said you must find substantial similarity based on protectable elements. It didn't. Nowhere said that. All the instructions say you may find substantial similarity in this case. And, in fact, instruction 42 gave an alternative path. If you find subconscious copying, you're done. You don't even have to look for substantial similarity. So we think 42 is erroneous, too. And it probably explains the outcome of the case. But second, Your Honor, the court shouldn't have told them that they can look for things not in the deposit copy. This is an easier case than cases about whether something is unprotectable because, like in an organizer, it's a common idea rather than expression or something that's censored there because it's stock and trade. This case just comes down to one very simple point. Was it in the deposit copy or was it not? And we know from Ms. Fennell's mouth itself that the CMX referred to by His Honor, the keyboard pitches and rhythms referred to in instruction 43 by His Honor, and the descending bass line referred to in instruction 43 by His Honor are not in the deposit copy. How do we know that? Look to ER-776, ER-797-98, and ER-807-08, and you'll see Ms. Fennell admitted they're not in the deposit copy. If they're not in the deposit copy, the jury shouldn't have been told to look. If they're not in the deposit copy, are they not relevant at all to the intrinsic elements or the intrinsic factors that the jury had to consider? They are not, Your Honor. Whether extrinsic or intrinsic, the jury was limited to comparing the deposit copy to third lines, and it didn't. I have other points about the reasons. Do you want to save some time? I would like to save some time, and I want to just point out that we also would request that a new trial is essential on damages, Your Honor, because the damages opinion was absolutely a textbook violation of Unilock, no benchmarks, arbitrary starting point, and you have to send it back at a minimum for a new trial on damages, but we think you have to send it back for a new trial on damages. Does Judge Cronstadt know how strongly you feel about this? I'm sure it may come across, Your Honor. Thank you. Thank you for being indulgent with the time. No, no, this is an important case. We'll work with you. So you're saving some time, Ms. Sullivan, and now your colleague, Mr. Haddad, is going to go forward, and you're going to save some time too, right? Yes, Your Honor, if I may. My name is Mark Haddad. I represent the Interscope Parties. My argument this morning will also apply equally to Mr. Harris, our co-accountant, and I'd like to save a minute if I can. The focus of my argument this morning is the district court's extraordinary decision to cast aside the general verdicts that the jury returned in favor of the Interscope Parties and Mr. Harris. And so how is this case different from Westinghouse? Your Honor, this is a profoundly different case from Westinghouse. Because the district court there was allowed to fix an inconsistent verdict. Well, the district court was allowed to fix it. Actually, neither the district court nor the Ninth Circuit explained under what procedural rule the district court was allowed to fix it. But I think the best way to think of Westinghouse is that it was so extraordinary that the general verdicts there functioned as a kind of special verdict. They had four general verdicts in a row with the jury all applying the same elements, coming to the same conclusion on an affirmative defense. And then they had a fifth general verdict where the jury received one additional incorrect instruction and came out the other way. And the court, rightly or wrongly, decided it had confidence that if it had not given that additional instruction on the fifth claim, the jury would have done the same thing it did on the other four. Now, you might think of this case, you're trying to make an analogy here. You know, what if there were, we have four distributors. What if the jury returned individual verdicts for each of the four distributors? Say three were found to have infringed, the fourth was not. And as to that fourth only, there was an additional incorrect instruction. Then we might have to really confront whether Westinghouse, you know, is valid. You'd have a sort of a Westinghouse issue. But here, the judge was speculating in two profoundly different ways. First, there is no striking pattern. If you look at questions two and three, one is liability, one is damages, the jury is perfectly consistent in saying that Mr. Harris and the four Interscope parties were not liable for infringement. Forgive me. I'm going to just tell you, you're eating up your time if you want to have rebuttals. So you have to decide what you want. We'll give you a little flexibility, but I just want you to know you're in your rebuttal time if you want to do that. Give me an extra 20 seconds. We're just talking here. So the core factual inference of substantial similarity is equally available to be drawn that there was substantial similarity or that there wasn't, depending on which of the defendant's appellants you're looking at. And Rule 50 and the Supreme Court's decisions in Uniform and Johnson, as applied by this court in NITCO, are clear without a proper Rule 50 motion, the court can't go making inferences about what the jury did. That's a square violation of the Seventh Amendment. I'd like to reserve if I could. Let me just see if I can synthesize what I understand your point to be. They didn't make a 50A motion, so they can't make a 50B motion. Perfect 10 v. Visa says that in order to have Mr. Harris liable, you've got to show he had an ability to control what was going on. There was no evidence of that. Is that your argument? It's certainly part of our argument, Your Honor. I would just add to that that the Supreme Court was clear in Uniform. You can't even draw inferences as to what the lawyers meant when they filed the imperfect Rule 50 or other motions. Clearly under the Seventh Amendment, you can't draw inferences about the jury's factual findings. I'm comforted to know that there is something clear that the Supreme Court said. Yes, Your Honor. Okay, you'll say something. Good morning and welcome. Thank you and may it please the Court. My name is Lisa Blatt, and I represent the heirs of Marvin Gaye, and I would like to reserve one minute for rebuttal on our cross-appeal. This Court has never overturned a jury verdict in a music copyright case, and this case should not be the first, and that is for three reasons. One, all but one of their arguments, each and every one of their arguments, with the exception of their challenge to Instruction 42, depends upon the flawed premise that Marvin Gaye had to point to published sheet music in order to prove the scope of his copyright. But your own expert admitted that she went beyond, in her own testimony on cross-examination, that some of the things that she said were not in the deposit copy. Right, and our first position, I mean I'm going to read you all the sites where she made clear they were in the lead sheet. Our first position is the other side loses big time unless you overrule and upset the way every copyright case has ever been tried under the 1909 Act, which has never been limited to the lead sheet. So this is sort of a made-up notion that somehow artists who were not fluent in staff notation are second-class citizens as opposed to people who wrote in sheet music. But we're happy to, you don't have to reach that big issue, because I'm happy to walk you through where this court at every single turn, at every single fork in the road said, I'm only going to let Marvin Gaye's family prove a substantial similarity based on the lead sheet. And there is extensive expert testimony on all the elements that they're complaining about, theme acts, descending bass line and keyboard, that those were in fact shown in the lead sheet. Let me make sure I understand what you just said. Because you're saying that in all the copyright litigation of this nature, evidence is admissible beyond just the lead sheet. And that's true. Some context has to be provided. Frankly, a lot of that is abuse of discretion evidentiary calls. But are you aware of any case where a musicologist expert was allowed to testify to inferences, artistic choices that can be made from the lead sheet? Because that to me seems to be fundamentally different. Judge Nguyen, that never came up because no artist, whatever, the lead sheet has never been an issue. You would never have a lead sheet. So now if you reverse here and say you're always going to have to have a lead sheet, remember the copyright office when you submit a lead sheet can burn it and destroy it on day one. So the notion that a lead sheet would ever be the focus of a copyright trial is very strange. But let's talk about the lead sheet and let's pretend that you do not have to address because we can win based on the trial record where it is. Whether something is or is not in a lead sheet is a factual question and it is beyond the can of lay jurors. We are not competent to recognize a lead sheet. And the lead sheets need interpretation. Their own expert admitted at trial that lead sheets have to be interpreted, which means what does it imply? And that requires testimony of what would have been apparent to a knowledgeable musician looking at the lead sheet. And we know from their expert Wilbur when she tried to play the lead sheet, she went contrary to it because she left out the baseline and just left that lobotomized song that they want you to listen to. It's actually contrary to the lead sheet. Let me ask you this, Counselor. You've made a pretty strong statement that basically the lead sheet is irrelevant under the 1909 Copyright Act. It's not irrelevant in terms of you have to have it as a precondition to registration. I don't mean to cut that off. And for purposes of the litigation of the type we're talking about here, I mean, I think it's pretty well known. I certainly am no expert, but I know that in the 20s, a lot of extremely talented African-American musicians came from the south and got all kinds of fabulous music, but it wasn't written down. Elvis Presley couldn't write his own music. Hank Williams and Jimi Hendrix. Yeah, all that. So you're saying, I gather, that because we've never depended on somebody being a Harvard-trained musicologist in order to be a good musician, the lead sheet is not the key. Well, the reason why it's not the key, even if you are an experienced person, fluent in staff notation, it's the recorded composition that Marvin Gaye, remember he composed this song by recording it and composing it in the studio with no written score. Wait a minute. I thought Congress passed a law in the 70s that basically changed it. So that's what we were going to look at, but there was no law to that effect beforehand. Is that incorrect? Well, the law that it stands is the 1909 Act. The one in this case. Yes. Right. But there was a subsequent act filed in the 1970s that was effectuated in 78. 1978, right. And under the 1909 Act, there's nothing that this work was an unpublished work and the protection was secured under Section 12 by depositing this lead sheet. And so the only question on what all their arguments depend on was somehow all these artists somehow disadvantaged systemically because they couldn't introduce, you know, the only evidence of the composition that they created that Congress wanted to protect. And the only thing that Pharrell Williams and Robin Thicke would want a copy is the actual song got to give it up. So let me ask you this. Can you name us some cases where probably for our court, but if not our court, some other court where what you say is the rule, in fact, was applied under the 1909 Act? Three Boys. Three Boys. That's our case. It's your case. It's the Isley Brothers in 1966. The actual recorded composition of Love is a Wonderful Thing was played. The other side made an argument, but that's not what the lead sheet said. But the Three Boys deals with the scope of the deposit copy when they were, in that case, they were wrestling with whether there was jurisdiction based on a deposit copy that was not fully complete. So is that? Well, it's the same argument. They're saying the deposit copy is not fully complete. But the panel that sat on Three Boys would be shocked to hear that they were wasting their time because what was Michael Bolton should have never had to be, you know, limited to the recorded composition. Yes, it was jurisdictional, but you still have to have a deposit copy. What do you compare it to? Ms. Sullivan's made it clear that from her client's perspective, the lead sheet is the reference point. Everything stems from that. And that's made up. I know you disagree with that, but I'm saying what's the case law you have or what's the,  Is it a record? Is it something that they have, you can listen to it? Is that what we're going on? Is it the actual sound recording? Is that what you're saying under the 1909 Act? Absolutely. And that has been the way copyright cases have been tried from time immemorial up until this case. And that's why the Isley Brothers introduced their recorded composition. And that's under the 1909 Act. Absolutely. There is nothing in the 1909 Act that limits the evidence that you can use to prove the scope of your work. Under their position, any artist who can't get the deposit copy, a Motown largely African-American artist who the Copyright Office said, sorry, it's not here, well, they're out of luck. Well, then why did you follow the tactics that you did? I don't know whether you'll try it while you're here or not, but, I mean, you all understood, I think, that the lead copy that was deposited in Washington was the key because Finnell and Mommasen both referred to it, both talked to it on it. Why did they do that if that didn't matter? Because at summary judgment, the court held, the court adopted, at every turn the court adopted their legal test and said, jury, you can only find substantial similarity. That's a legal issue, not a factual issue. Why was that? Because the sound recording was excluded. Oh, okay. So they didn't have a choice. Did you argue before Judge Kronstadt that, hey, Your Honor, you've got this all wrong, we really need to have a sound recording, that's when you can really tell what's going on here? Yes. If you read the summary judgment order, which is very extensive, and all the pretrial orders, the court keeps going on and on and on. I know you think the sound recording is the best evidence, but can we stay focused on the lead copy? You say the sound recording is relevant because it's not really excluded under 1909, not because of the intrinsic part of the substantial similarity test. It is, yes, in the sense of the jury here, there was a cop-to-esque trial here. The jury was looking at a lead sheet that no one was intended to read, no one ever intended to play it, and they were forced to listen to artificially created music that no one would want to listen to, when the elephant in the room was the recorded composition that Marvin Gaye composed. That's what the Copyright Act intended to protect, not from, you know, I don't even know what you want to call what they want you to listen to, but that was not a Motown party funk song that we all know Marvin Gaye tried to do it. Is this the reason for the reference to inferences and things of that nature that Fennell and Monson talked about? In other words, here is kind of a shorthand for this, but any knowledgeable musician is going to understand what you need to do here. And don't forget, their experts said the same thing. I'm ignoring the lead sheet because I don't like the way it sounds, and I know that that's not what they intended. We already know what Marvin Gaye intended by the lead sheet. We know he did not intend to create a Klezmer song. We know he intended to create a Motown song that you're supposed to dance to. As I understand it, Marvin Gaye didn't actually even write this music. No one wrote it after the fact, and that's, again, why this is Kafkaesque and upside down. We're trying to say, well, what does the lead sheet reflect when we know the lead sheet was based on something that was created first? But let me just correct, if I can make your job very easy, because I don't think you need to reach this threshold issue because the court excluded any and all element that was not in the lead sheet, the percussion, the party noises, the backup vocals. So anything that's not in the lead sheet, the jury never heard. Was the jury properly instructed to do that? Yes. Did you focus specifically on instruction number 43? Right. And instruction, okay, well, I can do that first. The lead sheet has to be interpreted, and each side offered competing expert testimony on the factual question of what's in the lead sheet. Their expert said keyboards, bass line, and theme X is not in the lead sheet. Our expert said it is in the lead sheet. And the court would have committed legal error had the court taken that issue away from the jury. The jury heard testimony, extensive testimony, that these elements were absolutely in the lead sheet. Let me give you just page 547. But they were extrinsic elements? Yes. Let me just read it. Judith Fidel's expert was asked, is each element that you've identified as being very similar to blurred lines reflected in the deposit copy? Answer, yes. Are the keyboard parts that are within the audio transcript you heard, are they in the lead sheet? Answer, yes, 548. Is theme X, in your opinion, in the deposit copy filed with the U.S. Copyright Office? Answer, yes, 828. On 612, theme X is in the lead sheet, and it's consistent with and reflected by the lead sheet. Descending bass line on ER 634, is the descending bass line in the lead sheet? It is shown in the lead sheet, yes. Instruction 035, though, and the court spent four pages in the new trial order saying, you've got to be kidding me that I messed up in this instruction. Instruction 035 said, jury, copyright is limited to the elements shown in the lead sheet. So they had to find, in order to render for Marvin Gaye, that these were in the lead sheet. He told the jury, you've heard conflicting expert testimony as to the factual question of what's in the lead sheet, and you are not allowed to consider the commercially released sound recording. And the jury came back with expert testimony. I haven't looked at the cross about what's in the lead sheet, but whatever it is, Wilbur on cross said, yeah, I ignored the lead sheet, and I played to the jury this recording. What about, I'm sorry. The dream games of Arizona versus PC on site, I don't know if you're familiar with that, but it seems like the holding there is that the jury's consideration of the work as a whole is only proper so long as the unprotectable elements are identified. And here, I'm just trying to figure out if the jury's instructions did not list what the elements were. Yes, so those were the five instructions. But just remember, before the courtroom even opened, the judge excluded any and all things that were, there was no argument about the lead sheet. The jury never heard the percussions, never heard the cowbells, never heard the backup vocals, never heard the party noises. It's not like he let the jury consider it. Remember, the sound recording was barred from the courtroom. And only elements that there was factual expert testimony that were in the lead sheet, and then there were seven. And remember, only three of them, they even argue. They keep saying it over and over. Well, the jury heard stuff that's not in the lead sheet. Well, but we had a trial on that question. That's what this seven-day trial was about, was what was in the lead sheet. That's why, you know, there's 600 pages of transcripts arguing about what was in the lead sheet. And the jury voted our way. They lost. They lost on the factual issue. It happens in trials. So from your perspective, the trial judge bought the argument that for the, I'll call it the thick parties, no offense, Mr. Williams, but that's what the pleadings call it, basically totally were stuck to the lead sheet, excluded anything related to the sound recording. And you're saying that even with all of that, with the expert testimony that showed the elements that were included within what was in the lead sheet, you still won and there's no basis for overturning it. Yeah, you can't overturn it. It's just a pure factual question. There was evidence. I know they want to pretend that stuff snuck in there because they don't like the jury. Well, given that access was undisputed in this case, what was the relevance of Mr. Williams and Mr. Thick's prior interview statements talking about being inspired by Gotta Give It Up? I mean, every single artistic creation is inspired by prior works. So the four things that why those, and again, the district court does an amazing job on this. Mr. Thick and Williams said that they independently created it, so that was certainly relevant to disprove their affirmative defense of independent creation, that they admitted that he was Marvin Gaye when he tried to write the song. Second, we could have gotten higher damages had we proven willfulness. Third, it was always relevant to impeachment. And fourth, I can't remember, but the district court's decision lists it. So the district court said, you know, you don't want this coming in, but you're the one saying you're innocent. You're the one saying, you know, in fact, they said that Mr. Thick denied even composing it, even though on national press he said, you know, I was in the studio, wanted to make a song like Gotta Give It Up. So I don't know how they get prejudice when that evidence was independently admissible. Omni, can I just address the summary judgment issue really quickly? Because they did not make the Rule 50A, they only can get a new trial. And they're trying to say under Benuelo's and Fireman's Fund that somehow this is a pure issue of law. And if this is a pure issue of law about whether the evidence was sufficient on substantial similarity, Ortiz just doesn't exist. I mean, Ortiz might as well throw that out the window. The judge on any pure issue of law voted their way. We lost it every single turn. And basically the theme of this case is that both hands were tied behind the Marvin Gaye's, you know, blindfolded and handcuffed and still won the trial. And now, you know, they're stuck with the fact that the jury found for them. So once all legal issues were sorted, they adopted their legal standard, they said everything has to be limited to the lead sheet. There were six remaining elements that they conceded were in the lead sheet. And the judge even says that. This judge was, you know, knew an appeal was coming. He said, you conceded all these items are in the lead sheet.  and that's enough to go to the jury. Can we talk about damages? Yes. So, Unilocked, that's, you know, one of their main arguments. That's a federal circuit decision. And that was a case that said the Daubert, under Daubert, it failed because the rule of thumb of the 25% was made without regard to patent, without regard to the invention, without regard to the industry, and without regard to the parties. Here, the damages expert, Nancy Stern, said, I've been doing the music business for 20 years. I'm one of four people that does it. And I'm telling you, music, a song, half of it's lyrics and half of it's music. So, she didn't just pick this number out of, if she had been reviewing books and TVs and movies and sculptures and said, oh, it's always 50-50, we might have a Unilocked problem. But she said, I'm looking at music, I'm looking at this license, I mean, this song, every case is unique, but I can just tell you the way you would start out is half a song is music, half a song is lyrics. I don't think there's anything remotely fundamentally flawed about that as opposed to what was happening in the federal circuit decision. And that federal circuit decision goes on and on and on about, that was just data aggregated regardless of, you know, anything. And this was very focused. There wasn't any kind of a Daubert hearing on any of these experts, was there? There was constantly Daubert stuff submitted on the papers. On the papers, okay. Yeah, so there's repeatedly, they go through Daubert, and Nancy Stern went through, she actually was questioned outside the presence of the jury, and Judith Finnell, I think, had to keep giving affidavits. So, in effect, there was. Yeah. On the damages, Oracle demands a pretty exacting standard. What's your response to that? Right, well, so Oracle has to be substantiated and non-speculative. The answer is, there's four people in the business that do this. She cleared thousands and thousands of records and did negotiations for licensing. She looked at not only Judith Finnell's testimony, she looked at the lead sheet. She said, you've copied the heartbeat and pulse of the song, and I'm going to base it, you know, on my experience of 50-50. But even that issue, though, Judge Merguia, is dependent on their threshold assumption that the lead sheet, you know, was only, the lead sheet was all that you could look at. So even their damages arguments depend on, you have to reach our issue, our cross-appeal issue, to vote for them on anything except for instruction number 42, which is the. Can I have you get back to the Daubert issue again? Did they ever ask the court to engage in a Daubert analysis with regard to Finnell's testimony as to each of the elements that she deemed similar? So, for example, okay, well, let me challenge the signature phrase, the hook within the signature phrase, B-max, the four-note, how that's not so unique. And basically have the court go through each of that so that the court can then limit the scope of Finnell's testimony. I think that would be erroneous under Three Boys and Swirsky when you can have a combination of unprotected elements, even if it just seems unfair. But remember, four out of the seven issues they concede are in the lead sheet. So I don't know why you'd have Daubert. They don't argue that the signature phrase, the hook, and the baseline, which are key parts, are in the lead sheet. So I don't know what their Daubert testimony would have been. They don't have any argument that Parlando is not in the lead sheet or word painting. Their argument is as a jury, as a jury issue. That's not creative. That's not significant. When all but two bars of this 130-bar song, there was expert testimony that it was substantially similar. So their only Daubert problem was you had heard the sound recording. Another thing I really have to mention is their expert also started with the sound recording. She heard the sound recording first. She transcribed the sound recording. And she said, when asked, well, why didn't you just do the lead sheet? She said, oh, it's substantially the same. I'm not going to go back over it. So both experts looked at the sound recording. And in interpreting a lead sheet, it would be really bizarre not to hear the sound recording when you know that's what the lead sheet was based on. Okay. Now, you're tying us up. So what I'm going to do is, with respect to both sides, we're going to give each of you an additional three minutes to rebut. Okay? I don't know which one. You probably want to start, Ms. Sullivan, or you want to start? Who's going to do the rebuttal? I have a few others. He's Mr. Harris. You went through 20 minutes. That's what created the problem. I ate into the Mr. Harris issue in Attorney Seals. Or Mr. Harris. Okay. All right. I'll tell you what. Why don't you come up, and we'll give you the five minutes you thought you were going to get, and we'll cut down on the amount of rebuttal time, but we'll try to balance it out because this is an important case and we need to get your input. Good morning. Good morning. My name is Richard Bush. I represent Marvin Gaye's family. I'm here on three issues. First, on fees. More than 20 years after Fogarty, the Supreme Court took up the issue of fees in Kirstein because of a concern that courts were placing too much weight on the reasonableness of a losing party's position and remanded because of the concern that the lower court gave greater weight to a losing party's position than may have been apparent from the actual decision, even though the lower court there followed the Fogarty factors. This case is exactly the same, and this court should vacate the fee denial and remand to allow the district court to take another look. In addition, and as yet another basic remand, is that the district court clearly gave substantial weight to the appellant's success on the lead sheet issue. If this court and the district court did that in both the purpose of the copyright section and the factual and legal reasonableness sections, if this panel were to reverse on the lead sheet, and just to be clear, Your Honor, the lead sheet was brought up by the defense and we responded in the district court. In answer to Your Honor's question, I was the trial lawyer that litigated it, and we responded by saying, never before in history has a case been limited to a lead sheet, ever. In every copyright infringement case since the beginning of time, the recorded composition has been the basis of the claim. Can you give me, I know she gave me three boys, what other cases can you cite me to where the sound recording was in fact the base reference under the 1909 Copyright Act? One is a case by the name of Bridgeport Music v. Bad Boy Records. Bridgeport Music, is that our case? That's a Sixth Circuit decision. There is a case involving another Bridgeport case, Bridgeport Case v. A&M Records, that involved the composition Atomic Dog. It was a post-'76 composition, but the defendants in that case raised the same claim, that the elements that were allegedly infringed went beyond the lead sheet, and the court rejected it, noting that the recording was created first and the recorded composition is the best evidence. But the Bridgeport is not only out of circuit, but it's a post-1978 case, isn't it? No, it's not. So in the Bridgeport case v. Bad Boy Records, it involved the copying of a 1972 song by the Ohio Players singing in the morning. So just like this case, it was a case involving the infringement of a pre-'76 composition that would have been covered by the 1909 Copyright Act. Won't you cite on that, please? I don't have the exact... You don't? I'm shocked. I apologize. I don't have the exact cite, but it's a Sixth Circuit decision. Can you get that for us, please? Yes, I will. The 28-J letter. Yes. And I can easily come up with many more cases where that's the case, because, in fact, this is a completely novel decision never before found by any court in history. And so that is why when the court issued this decision, we did... or when the appellants raised it, we absolutely responded by saying, never before has this been the case. And the 1909 Copyright Act, just to be clear, doesn't require publication in order to define the scope of the copyrighted work, period. So, if I understand the logic of your position, since the Copyright Act, 1909 Act, does not require the deposit of the lead sheet, how could you possibly prosecute an infringement if there was no such deposit? The 1909 Copyright Act does not require written publication in order to define the scope of the work. That is the bottom line. But it does require it to prosecute, basically. You have to have something filed with the Copyright Office, but never before. And this is also block letter law. The copyright deposit does not define the scope of the work. It just identifies the work, period. It's only there for identification. It's ministerial. That is why this decision is the first of its kind, never before held in the history of copyright law. And furthermore, just as a practical matter, if your honors were to affirm that part of the decision, you'd have this dichotomy where, for post-'76 compositions that are infringed, you can play the recorded composition, but for pre-'76, you can't. You have two different types of copyright trials. It makes no sense. There's no foundation for this in the law whatsoever. So, in getting back to your... From your side's perspective, if we were to do the right thing, we would say that it doesn't... The lead sheet is not the reference point. Absolutely. It's the sound recording. It's the recorded composition. And by the way, the Copyright Office now recognizes that because it allows the recorded composition to be submitted as the composition. Because in a... The way modern music is created, just like Marvin Gaye created in the studio, first, there's nothing written down. It's not classical type. It's like Heskey, Beethoven, where you wrote down sheet music, and that's the composition. This is recorded in the studio. And this is just purely ministerial. Somebody who knows who came along later and just wrote down a lead sheet in order to get it on file with the Copyright Office. It is bizarre to think that that then becomes the composition, and it deprives the artist of the work that he created. You're now saying that the transcriber who came in after the fact now is the author, and it's not Marvin Gaye? Okay, I... Go ahead. Is that a court problem or a Congress problem? It's neither because... It is a problem that does not... It is not required by the law. In other words, the 1909 Copyright Act, and I would urge your honors to read the social justice amicus brief that was submitted and the brief by the musicologist. 18 of the greatest musicologists in the world who support the Gaye family, but the social justice brief, the amicus brief that was filed, as well as our brief, sets forth in detail why in the 1909 Act, the legis cannot be, the written notation cannot be, should not be, is not the definition of the composition. Okay, we've let you go a little bit, so... You can use that part of your rebuttal time if you want. You could probably talk for a long time. I can. And I will just say one last thing. The cases that my opponent cites on the adding of Mr. Harris and Interscope to the case, this court's decision, El-Hakam and Westinghouse, dead on point, those cases involve not raising the release in a 50-B motion, and then the appellate court not having the ability to give grant relief, not raising 50-B. We did raise this issue. Okay. We appreciate that, and we know that the counsel are all enthusiastic and feel strongly about their position. Before you get up, Ms. Zolomon, the court is going to take a two-minute break, and then we will be back, and we'll have each of you have three minutes, if that's a fair rebuttal time, and we'll go from there. So we'll take a two-minute recess. Thank you. All rise. This court stands in recess for two minutes. This court stands in recess for two minutes. This court stands in recess for two minutes. This court stands in recess for two minutes. This court stands in recess for two minutes. This court has resumed its session. Thank you for your patience. Ms. Zolomon, please proceed. Thank you, Your Honor. Three points. The 1909 Act does not cover sound recordings. Instruction 43 was erroneous,     Thank you. All rise. This court stands in recess for two minutes.  Instruction 43 was erroneous. Intent was irrelevant, and Instruction 42 was wrong. Let me start with the 1909 Act and try to clear up some confusion here. I think Congress would be quite shocked to find out from my friends on the other side that it hadn't really done anything in 1976, or again in 1997 in the amendments where it said that sound recordings were not publications under the 1909 Act. Sound recordings became publications protectable under federal copyright only beginning with the 1971 amendments to the 1979 Act. So sound recordings are not protectable. Second point is the reason the deposit copy is the copyright here has nothing to do with publication. The 1909 Act let you get copyright either of two ways. You could publish your sheet music and claim copyright in it, or you could rely on the deposit copy filed at the copy office. The copyright owner here was Jobette Music Company. If you look in the record at 2446, you'll see it wasn't Marvin Gaye who sought the copyright. It was the great Motown publisher that published so many of these works by transcribing them. And when Jobette filed the deposit copy at the copyright office, it's because it elected not to publish a different set of sheet music. Let me ask you this. I'm familiar with the Acts in the 70s by Congress, but let's just assume hypothetically that no one had deposited this copy, the deposit copy. Could the Gaye family have prosecuted this case? In other words, there's no lead copy. It's just not there. No, Your Honor. The sound recording was not capable of being a publication under the 1909 Act. Sound recordings couldn't be federally protected publications until the 1970s Act. Okay, so bottom line is Marvin Gaye sings the song, but they didn't deposit the copy. Somebody uses it. There was no protection. Not under federal law, Your Honor. I want to understand that, because even though sound recordings are not protectable, why does that mean that the jury can't hear evidence about interpretation of the lead sheet? Because that's kind of where we're coming down to. Absolutely, Your Honor. Let me answer that. The sound recording is not properly evidence of the meaning of the lead sheet, and therefore the district court properly excluded it, and you should not grant the conditional cross-examination. It contains all these unprotectable elements as well, which may unduly sway the jurors. That's exactly right, Your Honor. Let me just put the point a simple way. A song can have 20 different covers. When you hear Mr. Tambourine Man sung by the Byrds, it's the same song, but it sounds really different from Bob Dylan. When you hear Jimi Hendrix improvise guitar riffs on The Star-Spangled Banner, it's Francis Scott Key's song, but it's a different interpretation. The sound recording is not probative of what the song is. The song is what was in the lead sheet, and they had to prove, the Gayes had to prove, that there is substantial similarity to the protectable elements in the lead sheet, and the sound recording introduces a lot of unprotectable elements that are not in the lead sheet. They should have been excluded from the case. It wasn't good enough that the district court excluded the sound recording from evidence, because he let the sound recording back in through the back door when Finnell and Monson could testify to mash-ups with Marvin Gaye's vocals and testify about bass lines playing Marvin Gaye's bass. That sound recording evidence, I know you don't like to reverse for the admission of evidence, and, Your Honor, there were dabberts on everything. Dabberts on Stern on damages, dabberts on Finnell on the protectable elements. So you should reverse on evidentiary error alone. I know we've gone beyond your time, but we can do that. Thank you, Your Honor. Is it your position that, note for note, the Gaye family can have no protection beyond the actual notes that are on the lead copy? Not at all, Your Honor. We think the Gaye family has full protection in the melody, the lyrics, the instrumentation that is noted in the copy. But you're saying that's what's in there. But what if it's not there? If it's not in there, you can't make it up, Your Honor. And that's the fundamental problem here. I'm not disputing, Your Honor, that you can have a musicological expert come in and try to interpret what's in the lead sheet. But what happened here was a travesty in which the musicology experts embellished the lead sheet, changed the lead sheet, rewrote the lead sheet, put things in that weren't in the lead sheet to their testimony, and that's what took this case off the rails. Those experts were cross-examined, I mean, pretty rigorously and vigorously. I think all those points that you were saying were made, so you're saying it's not a factual question, it's a legal question? It is, Your Honor, and that's clear from your case law, Swirsky and every other case on copyright. All of your cases say that it is the judge's obligation to be a gatekeeper. The point of the extrinsic test, as opposed to the intrinsic test, is to allow objective analysis. And the judge should have filtered that, and that gets to the heart of what's wrong with 43, Your Honor. And you've asked, what's the real problem with 43? I asked Your Honors to look at it. It's read to the jury at ER 88, and the key sentence that's wrong is said, to make the substantial similarity determination, you must consider the elements of each of the works and decide if they are substantially similar. What's missing there? He didn't say, you must look at the protectable elements. Is there any case where an expert was allowed to testify to the sort of inferences that Finnell testified to here, from which we have to distinguish in order for you to prevail? No, Your Honor. Let me just make a quick point. You're not changing the law of sound recordings in the circuit, if you agree with us. The other side has completely misrepresented that point. Sound recordings that came into other cases, like the Madonna case, V.M.G., the Three Boys, sorry, the Newton v. Diamond case, or the Swirsky case, those were all post-76 cases, as was the out-of-circuit Bridgeport case. But the issue in those cases were the sound recordings were similar. This is not a sound recording case, and Three Boys, Judge Merguia already identified why Three Boys is distinguishable. The sound recording there was just to fill in the jurisdictional gaps on whether a complete copy had been registered. And I commend Your Honor to look at Three Boys. The other side is dead wrong that the sound recording determined the scope of copyright in Three Boys. If you look at 212 F. 3rd at 486, you'll see that Three Boys was about the lead sheet. The lead sheet, because it was a 1909 act case, was the meets and bounds of the copyright. It was the scope of the copyright. And the expert for the plaintiff there even played the deposit copy for the jury on the keyboard. So sound recordings are not evidentiary of the lead sheet. The lead sheet is what matters. Before you conclude, just let me ask this one other time, and I'm going to ask it of your colleague on the opposite side here. What's the clearest authority, because I'm trying to figure out if we have one, for what the scope of the copyright should be? What's the clearest authority? What do you submit as the clearest authority for what the scope of the copyright should be? I know that you think the scope of the copyright is limited to the lead sheet, correct? It's the 1909 act itself, Your Honor. That's why I'm just wondering, do you have any other case other than 1909? Well, I think Three Boys is completely supported. It's a rare 1909 case. I just wanted to confirm, that's what you say is the clearest authority on that. And, Your Honor, the sound recording there comes in only for jurisdictional purposes, and if you look at page 486, the lead sheet sets the meets and bounds of the copyright. My learned friends on the other side are completely wrong that the 1909 act was ministerial. The copyrighted work under the 1909 act is either the publication, there was no publication here, could have been, wasn't, or the deposit copy that's filed at the Copyright Office. That's not ministerial. It's the copyright, and the copyright here was the lead sheet. So, Your Honor, the best authority is really the act. Three Boys is supportive. But, Your Honor, you asked, is there any other case where musicologists got to do this? And, actually, we know of none. Swirsky is obviously an important case for the circuit, but that was the mirror image of this case. Swirsky was a sound recording case. So, there, the court reversed Judge Snyder's granted summary judgment, saying, well, the musicologist should have been allowed to take the sound recording and turn it into a lead sheet by stripping out stuff that's in the sound recording. That's what was controversial there. We're the opposite. We know what the lead sheet is. That's the copyrighted work. What was wrong here is that the experts kept filling in all kinds of things that aren't in the lead sheet, should have been excluded, should have been downgraded, and then the instruction doesn't filter them out. So, Your Honor, when you look at the ADA, it really can't filter that. With great regret, we have to switch. We're going to go to the other side. Equal time on this. I'm so sorry that that has to come to an end, Your Honor. No, no, no. We... To close by agreeing with Judge Nyen, that instruction, she gave an independent reason for your reversal, which is instruction 42 is wrong because access is undisputed. There never should have been a subconscious copying instruction. And this case was turned into something that shouldn't have been. A case about inspiration. It should have been about the lead sheet. Thank you very much for your patience. Thank you. All right. We're going to give you nine minutes like we gave them nine minutes. It's longer than we originally thought, but fair is fair, right? Yeah. I don't do that all the time. Just starting with the 1909 Act, her position is that if it's a published work, that's fine. If it's an unpublished work, it's limited to the deposit copy. Why? I don't know. There's nothing in the Act that says that. There's... Since 1939, and these cases are cited on page 50 and 51 of our brief, the Supreme Court has said the deposit copy because it can be burned, destroyed, and thrown in the trash can. It cannot be indispensable to the copyright. It can't be. And I don't have a response to, yes, you've had to file a deposit copy. Absolutely. Because that's just like a trademark or a patent. You have to register. But it's never been thought of as the document that somebody wrote then, which can be destroyed, is all you would be limited to when all these artists pre-1976 or 78 didn't write sheet music. The other thing I think is confusing is the difference between a sound recording and a compositional copyright. This is a compositional copyright. It can be either found in two ways. It can be found in a recording or it can be found on sheet music. And because Marvin Gaye didn't write sheet music, he needs, like every other Motown artist would need, to be able to introduce the recording. But then, Cancel, what I'm troubled with on that is, as has been referenced, Congress enacted at least two acts in the 70s to bring the sound recording into the center of this whole item. Whether it was there before or not, they didn't think it was because they enacted this bill. How do we deal with that? You seem to be suggesting under the 1909 Act that the sound recording was the gold star. That's what you referred to, and yet they enacted this bill. Let me be clear. There are two copyrights in every song. There's the sound recording copyright that we're not suing under. And why that is irrelevant is that is a fixed group of sounds and songs and voices. And in order to have infringement, you have to recapture that exact series of fixed sounds. And obviously, so you would have to have a song got to give it up. You have to have sampling. This compositional copyright, you just need to prove access and substantial similarity. And the definition of a compositional copyright is anything that you can either read on a sheet music or hear with your own ears, the recording. That doesn't mean we're claiming a sound recording copyright. It just means the only evidence of what Marvin Gaye did was something that was simultaneously composed and recorded. And so that's why you have a recorded composition that's evidence. It doesn't mean... But in order to get that sense, if you will, you have to have heard his song, right? You have to have heard what he sang. The jury, that's why juries listen to the sound recording. Right. And that's why their expert also listened to the sound recording. But then on that theory, then the sound recording has to be limited to just the practical elements then in order to be fair, right? With all due respect, that's just wrong. If you have a sound, if you have a composition and a sound recording, it's protectable if it's creative. So I don't know where this is coming. It's something that for me that is unprotected. He sang one of the most creative, brilliant, geniuses songs we know of, of my time. Perhaps you misunderstood my question or perhaps I didn't articulate it properly. There are elements that are not protectable in the mashup and recordings that were played. And so that's why there's a jury instruction challenge because now the other side is saying that the court did not properly instruct the jury to filter out the protectable elements, the unprotectable elements and only make the comparison from the protectable elements. So I was just going off of your argument that your theory that the sound recordings that reflect the notes and composition on the lead sheet is admissible. And so on that theory, it should be admissible only to the extent that it's actually reflected in the lead sheet. So I was actually playing off of your point. Two arguments. If it was never limited to the lead sheet, their objection goes away because the lead sheet is just irrelevant. But if we take apart, we take, you know, just assume that they are right, that we're limited to the lead sheet and it's in order after order, the judge made the gay family edit every single item that was not in the lead sheet and only left in the sound recordings where there was factual expert testimony that it was in the lead sheet. And what they're asking you is to play musicologist and read this lead sheet. I don't know how you can look at a lead sheet and say, well, public, we read the lead sheet and I don't see the keyboard parts or I don't see the sitting bass line, when their expert said that but our expert said something different. It's just a factual issue. And so for you to go in and say it's unprotected, you have to be holding something's not in the lead sheet despite an expert, 20 years of experience, totally qualified, says any knowledgeable musician would know that you have to play a keyboard. You have an A7 chord that has to be read. It has to be, you have to look at what note, you know what notes play but you have to look at the rhythm they're playing and what order they're played. That has to be read into the lead sheet and their own expert admitted that all lead sheets require interpretation. Counsel, let me ask you this question. From your perspective, Judge Cronstadt just blew the legal aspect of this. He limited what could come in. It was limited to the protected elements in the lead sheet. You think that was entirely inappropriate. If, and this is just all arguendo, were we to agree with you about the key parts of the case, are you suggesting that the court should say we agree with the court but not for the reasons that the court said. The real issue here is you don't need to worry about the lead sheet. This is the standard. Is that what you're asking for? You could do it one of two ways. One and say you still have to address their challenge to self-conscious copying because that's independent of the lead sheet. Yes, you would say all their arguments were contingent on a flawed premise but, and I'm happy to have this, assuming they're right, the judge at the transcript at every hearing said, Mr. Bush, you are limited to the lead sheet. You are not allowed to ask any question that is not founded in the lead sheet. Rephrase every question you ask and make sure your expert testifies it's in the lead sheet. And then the expert testified why it's in the lead sheet. Why when I read an A7 chord you have to play a keyboard. And their own expert said, yeah, I had to play, I had to read the lead sheet, what's implied in there and she even went further and said, I'm going to imply something that's not in the lead sheet. The lead sheet says bass simile, which means play throughout and she just didn't play it. She said, well I didn't, I don't like the way that sounded, that I just, I'm going to interpret that it's not really there. So, I don't know how you could say our expert did something wrong because she talks about what is in the lead sheet and would have been apparent to any musician. Their expert said, I left out the lead sheet and I played in front of the jury a lobotomized, a basculated song that no one would ever want to hear because it grates on the ears and they told the jury that's what Marvin Gaye intended by the lead sheet and it's no surprise they lost the trial. Let me go back to something that I asked Ms. Sullivan earlier. Under Three Boys, and this is just my terminology, it seems like there's a sliding scale. The greater the access of the people      of direct copying. So, if that's the case, it's a sliding scale of the people who are allegedly infringing to the material, the song, the less evidence you have to show that that's the case. And if the experts on both sides having referred to inferences, if you will, that's my terminology on this, is that not perfectly proper within the scale to say, okay, you can't just look at it note for note. Anybody knows that you have to infer something here. Their expert said, no, not so much. They didn't challenge everything on appeal. You say, oh, yeah, plenty of it can be done, Ms. Monson. Ms. Monson's the head of the African-American music at Harvard University. She said, this is perfectly logical. It would have to be in there. Is that what we're supposed to do from your perspective? Well, two things. One, you could say, you know, the cross-appeal is that they're just wrong on that. But second, we don't have to reach that issue. It's hotly disputed. We don't know about the 1909 Act and hopefully never will. But this district court in the motion denying a new trial for four pages says, I limited the jury to four pages. I instructed them to stick to the lead sheet. I instructed them they had to stick to the lead sheet. I instructed them that if it seems affair, if it's common, if it's an idea, you cannot count it. So he lists six independent instructions that told the jury, here's your filtering. Do not go off the lead sheet. Do not look at unprotected elements. The gays will lose if you find that it's a seen affair or a common idea. It has to be shown in the lead sheet. And so I think this is one of the rare cases where the district court's opinion is so painstaking going through and he was slightly, I don't know how I could have been wrong on instruction 43 when there was expert testimony to support it. He does say that but then at some point he says, I'm going to let people testify to a little more of that to address these intrinsic factors. How does that affect? So intrinsic came in and this is another interesting part. Their view, if you're limited to the lead sheet, a plaintiff or their heirs I guess has to hire a band because you can't play the sound recording so we were supposed to maybe get a band to sort of play but got to give it up because you can't listen to the sound recording. And the judge said, oops, that's crazy. The jury for the intrinsic test has to be able to hear something so I'll let you take the edited sound recording and you have to strip out and pay money. You have to strip out anything where there's no expert testimony, no basis for finding it within the lead sheet. That's why the jury never heard percussions, the cowbells, the party noises. And then I just want to make sure I ask you the same question I asked counsel Ms. Sullivan. What's the clear authority that you submit as the clearest authority on what the scope of the copyright should be? The Sixth Circuit National Conference of Bar Examiners which cites the Supreme Court case of Washingtonian versus Pearson that says since the Copyright Office can throw this away it was nearly archival and to identify it can't be what's driving the scope of the copyright and it's a Supreme Court case. But the Sixth Circuit case says, well, that's a Supreme Court case that applies to both publications and unpublished works. It might be a Seventh Circuit case I'm sorry. A Bridgeport Sixth Circuit but I don't It's not That case is not under the 1909 Act. Okay. We thank you all. You probably will appreciate we're done on that side but you'll probably appreciate how much this court appreciates the excellent quality of the lawyers. We know you're enthusiastic, feel strongly about your views. This has been most helpful to us. So we thank you. The case just argued is submitted and the court will stand adjourned.
judges: M. Smith, Murguia, Nguyen